**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

SANTA FE COMMUNITY COLLEGE,

   Plaintiff/Counter-Defendant,

  vs.          Civ. No. 20-1151 SCY/KK

ZTARK BROADBAND, LLC, a cancelled
California Limited Liability Company,

   Defendant/Counter-Plaintiff.

<u>**MEMORANDUM OPINION AND ORDER GRANTING**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT***</u>

  This dispute arises from two 2006 broadband lease agreements, one made between

Plaintiff Santa Fe Community College ("SFCC") and Defendant Ztark Broadband, LLC

("Ztark") and one made between non-party College of Santa Fe ("CSF") and Defendant Ztark.

Although the lease agreements expired in May 2021, they contain terms which allow Ztark a set

period to negotiate renewal of the agreement on "terms and conditions substantially similar" to

those contained in the 2006 agreements. Doc. 68 at 3. Renewing the lease agreements under

similar terms provides a substantial benefit to Ztark because the market value of the leases has

increased considerably since 2006. SFCC therefore filed this action for declaratory judgment,

seeking a declaration from the Court that the leases are unenforceable because: (1) the FCC

never approved them; (2) the renewal provisions are unconstitutional: and (3) the renewal

provisions are unconscionable. Doc. 35 at 9.

---

*The Court refiles this Order (formally Doc. 116) with two edits: one on page 1 and one on page
35, footnote 15. The Court explains the reason for these edits in its November 28, 2022
Memorandum Opinion and Order Denying in Part and Granting in Part Plaintiff's Motion to
Reconsider. (Doc. 143).

Ztark seeks summary judgment on each of these requests for declaratory judgment and, ultimately, dismissal of SFCC's complaint. Doc. 53. Ztark's summary judgment motion was fully briefed on July 29, 2021 (Docs. 61, 76[1]) and the Court held a hearing on January 6, 2022 (Doc. 111). Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 11, 12, 13. For the reasons set forth below, the Court grants summary judgment in Ztark's favor as to all claims for declaratory judgment in SFCC's operative complaint.

## UNDISPUTED MATERIAL FACTS

Except as otherwise noted, the following facts are undisputed. Where facts are disputed, for purposes of this summary judgment motion, the Court views the facts in the light most favorable to SFCC, as the non-moving party.

SFCC is a community college organized under the New Mexico Community College Act.[2] Defendant's Undisputed Material Fact ("UMF") No. 1, Doc. 53 at 2. It receives approximately 80% of its funds from public sources: approximately 30% from the state legislature and 55% from local appropriations.[3] Plaintiff's Additional Undisputed Material Fact

---

[1] With leave of the Court, the parties filed sealed versions of their responses and replies, as well as unsealed and redacted versions. *See* Docs. 61 (sealed response), 72 (unsealed, redacted response), 76 (sealed reply), 80 (unsealed, redacted reply). Unless noted otherwise, the Court cites to the sealed response and reply, which have the same page numbers and pin cites as the unsealed briefs.

[2] In response, Plaintiff SFCC states that "Ztark's Material Fact No. 1 are legal conclusions, which SFCC disputes." Doc. 61 at 2. However, later in its motion, SFCC appears to embrace this asserted fact: "SFCC is a community college organized under the Community College Act." Doc. 61 at 20. Because Ztark's UMF No. 1 includes information other than SFCC's status as a community college, and given SFCC's subsequent statement, the Court assumes that SFCC disputes the other information, but not its status as a community college.

[3] These numbers create a question as to whether SFCC receives 80% or 85% of its funding from public sources, but this discrepancy is immaterial.

("AMF") No. 1, Doc. 61 at 7. The remaining 20% of SFCC's budget comes from tuition and fees. UMF No. 1. Ztark is a limited liability company that invests in radio wave spectrum. UMF No. 2. Tyler Kratz is the sole managing member of Ztark. Doc. 35 ¶ 5 (Amended Complaint).

In 1995, the FCC issued broadband spectrum licenses to SFCC and non-party College of Santa Fe ("CSF"). UMF No. 3. SFCC and CSF forfeited those licenses in 2005. UMF No. 3. In May 2006, Ztark entered into Memorandums of Understanding ("MOUs") with both SFCC and CSF under which Ztark agreed to initiate proceedings with the FCC to reinstate and renew the licenses. UMF No. 4; Doc. 61 at 2 ¶ 4. The 2006 MOUs provided that: "In the event that [SFCC/CSF] is successful in its efforts to obtain the reinstatement and renewal of the License, the Parties agree to negotiate in good faith a Capacity Lease Agreement substantially in the form attached hereto as Appendix A for the lease of the excess capacity on the Channels." AMF No. 2. Ztark's counsel prepared and filed an Application and Request for Waiver to Reinstate the SFCC and CSF licenses. AMF No. 6. The FCC reinstated and renewed the licenses in June 2009. AMF Nos. 3, 9.

Shortly after the parties executed the 2006 MOUs, but before the licenses were reinstated and renewed, Ztark entered into Capacity Lease Agreements with SFCC and CSF, where Ztark agreed to lease each school's excess broadband capacity for 15 years. UMF No. 5; Doc. 61 at 3 ¶ 5; AMF No. 3. SFCC points out that the lease agreements purported to lease excess capacity on licenses that were expired at the time. Doc. 61 at 3 ¶ 5. Both SFCC and CSF were represented by professional administrators and legal counsel during the negotiations of the agreements and, at all times since 2006, SFCC has been represented by legal counsel in connection with its dealings with Ztark. UMF No. 15.

The 2006 lease agreements contain several provisions that are relevant to this lawsuit.

First, Section 4(c) provides:

> The parties agree to cooperate to prepare and file with the FCC all applications, forms, related exhibits, certifications and other documents necessary to obtain the FCC's consent to this Agreement and satisfy the FCC's requirements for long term de facto lease approval as set forth in 47 C.F.R. § 1.9030(e) ("FCC Long Term Lease Application"). Each party covenants and agrees that it will fully cooperate with the other, and do all things reasonably necessary to timely submit, prosecute and defend the FCC Long Term Lease Application . . . .

UMF Nos. 6, 7; Doc. 61 at 3 ¶ 6; *see also* Docs. 53-5 at 5, 53-6 at 4 (lease agreements). Section 2(a) further provides that: "In no event shall Lessee have the right to lease or use the Excess Capacity as set forth herein until the date of FCC approval." UMF No. 7; Doc. 61 at 3 ¶ 7; *see also* Docs. 53-5 at 2, 53-6 at 2. As is relevant to this provision, there is no FCC rule requiring that approval of a license lease be sought within any specified period of time after the lease is executed. UMF No. 8. Further, the lease agreements provide that Ztark will pay lease fees to SFCC (between $35,000 and $40,000) and CSF (between $60,000 and $65,000) following the FCC's approval of the leases.[4] UMF No. 9.

Section 3(a) of the agreements provides that Ztark shall install "all equipment necessary for the transmission of service by Lessor and Lessee on the Channels . . . in accordance with any construction deadline which the FCC may impose on the FCC license." UMF No. 10.

Section 1(b) provides that Ztark has the right to renew the lease agreements on substantially similar terms for an additional 15 years. UMF No. 11. Specifically, the lease agreements provide:

> Beginning 180 days prior to the expiration date of the Initial Term, Lessee and Lessor shall have an exclusive 150-day period ("Exclusivity Period") to negotiate

---

[4] While the lease agreements refer to payments between $35,000 and $40,000 and between $60,000 and $65,000, in their briefs the parties only refer to the fees as $40,000 and $65,000, respectively. Accordingly, the Court will do the same.

in good faith for a renewal of this Agreement on terms and conditions
substantially similar to those contained in this Agreement for the leasing of the
Excess Capacity … During the Exclusivity Period, Lessor agrees not to engage in
discussions, negotiations, or consultations of any kind with any third party
regarding the lease of the Excess Capacity.

UMF No. 11.

Under Section 7(a), Ztark—but not SFCC—is authorized to terminate the agreements if

the FCC did not approve the agreements within a year following their execution. UMF No. 12.

However, under Section 7(c) either party may terminate the agreements "upon Material Breach

or default by the other Party of its duties and obligations hereunder," after first giving notice and

an opportunity to cure to the defaulting party. UMF No. 13, 14. Specifically,

[a] Party terminating this Agreement for Material Breach shall first notify, in
writing, the defaulting Party of the basis for such termination and the defaulting
Party shall have thirty (30) days from receipt of such notice from the non-
defaulting party to cure the Material Breach. If such Material Breach cannot be
cured with thirty (30) days, Lessee shall have taken such necessary steps to
commence and diligently pursue the cure of the Material Breach. If the cure
period lapses and the defaulting Party has yet to commence or diligently pursue
the cure of the Material Breach, this Agreement shall automatically terminate.

UMF No. 14.

The lease agreements came with two risks that the parties were negotiating around: (1)

that the FCC would not reinstate the licenses (which indeed, it did not do until 2009 over

objections from Sprint) and (2) uncertainty regarding whether the spectrum at issue in the lease

agreements would appreciate in value due to technology advances that would allow the spectrum

to be used by the mobile telecommunication industry. UMF Nos. 16, 17; AMF No. 9.

In 2010, CSF assigned its broadband spectrum license to SFCC. UMF No. 19. Ztark and

SFCC entered into an Agreement for the Transfer and Lease of Licenses and an Asset Purchase

Agreement regarding the license originally held by CSF (and now transferred to SFCC). AMF

No. 10. Ztark "undertook the effort and expense of making the necessary filings to obtain the

FCC approval of the license transfer." UMF No. 20. SFCC agreed to pay CSF $95,000 for the

assignment. Ztark agreed to pay this amount to CFS on behalf of SFCC. CSF and SFCC agreed

this would satisfy Ztark's lease fee obligation under its 2006 lease agreement with CSF. UMF

No. 19. The FCC approved the transfer in October 2010. AMF No. 13.

Between 2009 and 2011, SFCC and Ztark began negotiating new capacity lease

agreements. AMF No. 11; Doc. 76 at 2 ¶ 11.[5] SFCC points to these negotiations to argue that the

parties did not behave as if they had entered into the 2006 lease agreements. AMF Nos. 11, 12

(facts disputed). Ztark disagrees with this characterization and asserts that the negotiations

between 2009 and 2011 were for agreements intended to replace the 2006 agreements and,

because the parties did not execute replacement agreements, the 2006 agreements remained in

effect. Doc. 76 at 2 ¶¶ 11, 14.

In February 2011, Jean Moore, on behalf of SFCC, sent an email to Ztark asking Ztark to

"take final action(s) with the FCC necessary to effect the [CSF] transfer," and "[a]fter the

transfer from College of Santa Fe to SFCC is final, please cause Ztark to sign the attached

Capacity Lease Agreement for the transferred [CSF] license and also the attached Capacity

Lease Agreement for SFCC's existing license, and process the FCC approvals for those Capacity

Lease Agreements." Doc. 61-8; AMF No. 15. Mr. Kratz responded that the parties first needed to

make sure they met the FCC's substantial service requirement before the impending deadline.

Doc. 61-8.

At least in part to address this issue, SFCC and Ztark entered into a March 2011 MOU

regarding the installation of equipment in order to meet the FCC construction deadlines for

---

[5] This fact is disputed as to the purpose of the new lease agreements. AMF No. 11; Doc. 76 at 2 ¶ 11. Both parties, however, appear to agree that between 2009 and 2011 they were involved in negotiations for new lease agreements.

substantial service requirements for both licenses. UMF No. 21; AMF No. 18. The March 2011 MOU provided that "Ztark will timely install, at Ztark's expense, such antennas and ancillary equipment . . . as are minimally necessary to cause the Channels to satisfy FCC requirements for 'substantial service.'" UMF No. 21. Ztark completed construction that year, and the equipment installed on SFCC's campus allowed SFCC to use the licensed channels for communication on campus, whether or not Ztark used the excess capacity. UMF Nos. 21, 22. SFCC asserts that the 2011 equipment installation was in performance of the 2011 MOU and not in performance of any obligations under the 2006 lease agreements. AMF Nos. 17, 20 (facts disputed). Ztark disputes this and asserts that the buildout requirements in the 2011 MOU and in the 2006 lease agreements were the same and the purpose of the 2011 MOU was merely to authorize Ztark to enter SFCC's campus and install equipment. Doc. 72 at 2 ¶¶ 17, 20.

The 2011 MOU also provided that SFCC and Ztark "have agreed to enter into Capacity Lease Agreements . . . ." AMF No. 19. SFCC places significance on the absence of any reference to the 2006 lease agreements and cites this as evidence that that the parties would enter into lease agreements at some future date. AMF No. 19 (fact disputed). Ztark, on the other hand, points to the provision of the 2011 MOU which provides that, "Nothing in this Memorandum of Understanding alters any provisions of the . . . form Capacity Lease Agreements to which the Parties previously agreed. . .," which Ztark asserts refers to the 2006 lease agreements. Doc. 76 at 2 ¶ 19. The 2011 MOU likewise contained a provision that "Ztark will at Ztark's expense prepare, file and prosecute all documents and applications necessary to secure an FCC finding of substantial service for the Channels and, thereafter, to secure FCC approval of the Capacity Lease Agreements in accordance with the provisions of the Capacity Lease Agreements." AMF No. 21. SFCC reads this as giving Ztark sole responsibility to seek FCC approval of the 2006

lease agreements. AMF No. 25 (fact disputed). Ztark, on the other hand, asserts that this provision applies to the new, never-signed lease agreements. Because the new lease agreements never took effect, Ztark maintains that the parties' joint obligation to seek FCC approval under the 2006 lease agreements remained in effect. Doc. 76 at 3 ¶ 25.

After having signed the March 2011 MOU that addressed the substantial service issue (the 2011 MOU did *not* constitute a new capacity lease agreement), in June 2011, Ms. Moore and Mr. Kratz again exchanged emails, in which Ms. Moore attached "the final Capacity Lease Agreements again for everyone's convenience," and asked Mr. Kratz for an update because "[i]t would be good for the college to know when it will receive the $65,000 Lease Fee under the Capacity Lease for the license that was the college's all along." Doc. 72-10; AMF No. 23. Mr. Kratz responded, "Why don't we prepare to file the leases for this week or next . . . . If everyone is fine with that, I will make sure the leases are in order, we can execute, and then we will prepare the FCC filing. The school will then get paid after the public notice period which is approximately 30-45 days after filing." Doc. 53-11; AMF No. 24. After Ms. Moore did not respond, Mr. Kratz sent a follow-up email to which Ms. Moore responded, "Thank you for following up. I have emailed SFCC about this and will let you know." Doc. 53-11. The parties dispute who then had the responsibility to move forward with signing the new capacity lease agreements. AMF No. 27 (fact disputed) (SFCC asserting that "Ztark made no effort after the installation of the substantial service equipment under the 2011 MOU to move forward with signing the Capacity Lease Agreements negotiated between 2009 and 2011 or secure FCC approval of those or any other Capacity Lease Agreements."); Doc. 76 at 3 ¶ 27 (Ztark disputing this fact and stating: "The emails show that Mr. Kratz was waiting to hear from Jean Moore, SFCC's lawyer. If anyone dropped the ball, it was Moore."). The parties do agree, however, that

they never signed the capacity lease agreements that were the subject of their negotiations between 2009 and 2011. AMF No. 23.

In 2015, the licenses needed to be renewed. Mr. Kratz contacted SFCC for permission to file the paperwork with the FCC for renewal, and SFCC agreed. AMF No. 28. Mr. Kratz worked with SFCC's new Vice President of Finance and CFO, Nick Telles. AMF No. 28. SFCC asserts, and Ztark disputes, that during his conversations with Mr. Telles, Mr. Kratz misrepresented that he owned the licenses. AMF No. 29; Doc. 76 at 3 ¶ 29 (fact disputed). SFCC further asserts, and Ztark disputes, that in 2018, Mr. Kratz misrepresented to Mr. Telles that he would make "additional payment" to SFCC if SFCC applied to the FCC for white space. AMF No. 30; Doc. 76 at 3 ¶ 30 (fact disputed). SFCC claims this offer for "additional payments" was a misrepresentation because Ztark had not submitted the 2006 lease agreement for FCC approval and therefore never made any payments to SFCC under the lease agreements. AMF No. 30; Doc. 76 at 3 ¶ 30 (fact disputed). Ztark disputes this fact, asserting that it paid SFCC the $65,000 lease fee owed under the CSF lease as part of the $95,000 it paid when CSF transferred its license to SFCC. Doc. 76 at 3 ¶ 30.

In 2019, Mr. Kratz sent a letter to SFCC regarding white space. The white space letter proposed that Ztark and SFCC "amend the lease to include the renewal date consistent with [the 2011 MOU] discussing the leases in light of the substantial service build out," and that "[i]f SFCC would like to extend the terms of the agreement, I am not opposed to discussing making the renewal payment now to begin a new 15-30 year term." AMF No. 38. SFCC asserts the letter gave an incomplete and misleading history of the licenses. AMF No. 31; Doc. 76 at 3 ¶ 31 (fact disputed). For example, in the History of Licenses section of the letter, Mr. Kratz included the 2006 MOUs, the 2010 CFS transfer, and the 2011 MOU regarding substantial service. AMF No.

33. However, SFCC asserts that Mr. Kratz (1) did not mention the 2006 capacity lease agreements or the capacity lease agreements negotiated between 2009 and 2011 that were never signed, (2) did not mention that the FCC never approved the 2006 lease agreements, (3) did not mention that Ztark never paid SFCC the lease fees, and (4) did not mention that Ztark never made use of the 95% of the capacity it leased. AMF No. 34; Doc. 76 at 3 ¶ 34 (fact disputed). SFCC alleges that the letter also gave the incorrect impression that Ztark paid SFCC upfront for the licenses and that the unsigned lease agreements negotiated from 2009 to 2011 were the operative agreements. AMF Nos. 35, 36; Doc. 76 at 3-4 ¶¶ 35, 36 (fact disputed). The letter likewise misstated the commencement date of the lease agreements and so misstated the renewal date. AMF No. 37. Ztark counters that Mr. Kratz inadvertently made some misstatements but Mr. Telles, who had counsel, admits he was not misled. Doc. 76 at 3 ¶ 31.

Ztark also points out that, regardless of what Mr. Kratz did or did not tell Mr. Telles in 2019, by 2011 SFCC's legal counsel was aware that the FCC had not approved the 2006 lease agreements and that Ztark had not paid SFCC's lease fee. UMF No. 26. Despite this, until it filed the complaint in this action, SFCC never complained about Ztark's performance of its obligations under the 2006 lease agreements. UMF No. 25. Indeed, SFCC never notified Ztark of any default or breach of any obligation under the terms of the lease agreements. UMF No. 28. SFCC counters that Ztark was providing SFCC incomplete, inaccurate, and misleading information in the months leading up to the lawsuit. Thus, it could not determine which agreements had been executed, whether the agreements had FCC approval, what equipment Ztark installed, whether SFCC had received a lease fee, and which provisions of the lease agreements had been performed. Doc. 61 at 6-7 ¶¶ 25, 28.

A few months after Mr. Kratz sent SFCC the 2019 white space proposal letter, Mr. Kratz sent SFCC a February 2020 email with a different proposal regarding assignment of the leases, renewal of the leases, or purchases of the leases. AMF No. 40. SFCC asserts that Ztark proposed assigning the leases, even though it had already entered into an Amended and Restated Asset Purchase and Contribution Agreement ("APA") that included assignment of the leases to a third party. AMF No. 41; Doc. 76 at 4 ¶ 41 (fact disputed).[6] Ztark also offered to have a new entity purchase the licenses for a fraction of the amount for which it assigned its leaseholder interests and a fraction of the value of the licenses. AMF No. 43; Doc. 76 at 4 ¶ 43 (fact disputed).

SFCC asserts that the communications between the parties in 2020 further show that Ztark did not intend the 2006 lease agreements to be the actual agreements between the parties. First, the 2020 APA indicates there was some confusion regarding which capacity lease agreements were enforceable. AMF No. 45; Doc. 76 at 4 ¶ 45 (fact disputed). Additionally, SFCC asserts that Ztark's February 2020 email proposed renewing the lease agreements, but it was not clear which lease agreements Mr. Kratz was referencing (the 2006 signed agreements or the later negotiated but unsigned agreements). AMF No. 42; Doc. 76 at 4 ¶ 42 (fact disputed).

Renewal of the leases is an important consideration because, in 2018, the telecommunications industry began using spectrums like the ones the FCC licensed to SFCC in implementing LTE and 5G technology. UMF No. 23. Since 2020, the FCC has allowed broader ownership of the type of licenses SFCC holds. UMF No. 23. As a result of both these changes, the value of SFCC's licenses and the leases of those licenses has increased dramatically. UMF No. 23. Both parties recognize this substantial change in value. UMF No. 24.

---

[6] SFCC contends that Ztark's assignment took place in November 2019, even though Ztark did not notify SFCC until September 10, 2020. AMF No. 44; Doc. 76 at 4 ¶ 44 (fact disputed).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted).

## DISCUSSION

In its first amended complaint, SFCC seeks an order from the Court on "the rights and responsibilities of SFCC and Ztark as they relate to the Leases, and whether the Leases are enforceable, including but not limited to":

- Under the New Mexico Constitution, Art. IX, Section 14 (Anti-Donation Clause), as a public institution SFCC may not sell or lease a public asset for less than fair market value. Forcing SFCC to renew the Capacity Lease Agreements on substantially the same terms would be a fraction of the fair market value, in violation of New Mexico's anti-donation clause.

- The Capacity Lease Agreements were never consummated and therefore are not enforceable. The parties were required to cooperate to timely submit applications to the

FCC for approval of the Leases. This was never done. At this point, nearly fifteen years later, a timely application is not possible. As a result, Ztark never had the right to use and never actually used the 95% as the Capacity Lease Agreements state. Ztark also never paid a Lease Fee to SFCC. This is all consistent with a track record of poor or no performance of the obligations under the Leases.

- The Capacity Lease Agreements, particularly the requirement to renew the Leases "on terms and conditions substantially similar" are unconscionable, particularly under these circumstances.

- Ztark's unclean hands and false representations and warrantees to SFCC regarding the legal status of the Leases.

Doc. 35 at 8-9. As such, SFCC seeks a declaratory judgment as follows:

- A Declaration from the Court that the renewal provisions of the Capacity Lease Agreements cannot be enforced against SFCC because enforcement would be unconstitutional;

- A Declaration from the Court that the Capacity Lease Agreements cannot be enforced against SFCC because the FCC has never approved them; and

- A Declaration from the Court that the Capacity Lease Agreements, particularly the renewal provisions, cannot be enforced against SFCC because they are unconscionable.

*Id.* at 9. Ztark moves for summary judgment on each request for a declaratory judgment and the Court will address each in turn.[7]

In this diversity action, the Court must apply the substantive law of the state. *See* Doc. 1 at 2 (Notice of Removal, indicating removal pursuant to diversity jurisdiction); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Ztark indicates that the lease agreements include a choice of law provision providing that California law should govern. Doc. 53 at 9 n.1. However, Ztark "understands that SFCC contends that New Mexico substantive law should apply . . . on the

---

[7] Although SFCC indicates in its amended complaint that it has questions about the enforceability of the lease agreements given Ztark's unclean hands and false representations, in its prayer for relief it does not ask for a declaratory judgment on that issue. Accordingly, when moving for summary judgment and dismissal of the amended complaint, Ztark only addresses the three issues SFCC seeks declaratory judgment on and the Court likewise only addresses those three issues. *See* Doc. 53 at 22 n.8.

theory that the agreements, including the choice of law provision, are unenforceable." *Id.* (citing Doc. 7, Joint Status Report). Both Ztark and SFCC analyze the issues under New Mexico law and neither develop an argument that California law should govern. Accordingly, the Court will apply New Mexico substantive law.

**1. SFCC is not subject to the Anti-Donation Clause.**

The Anti-Donation Clause of the New Mexico Constitution provides that "[n]either the state nor any county, school district or municipality, except as otherwise provided in this constitution, shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any person, association or public or private corporation . . . ." N.M. Const. art. IX, § 14. SFCC argues that, under the Anti-Donation Clause, "as a public institution, [it] may not sell or lease a public asset for less than fair market value." Doc. 61 at 19. Ztark, on the other hand, asserts that SFCC is not subject to the Anti-Donation Clause, and even if it was, the consideration the clause requires need not amount to fair market value. Doc. 53 at 9-11. The Court agrees with Ztark that SFCC is not subject to the Anti-Donation Clause.

The Court begins its analysis by looking at the plain language of the New Mexico Constitution. New Mexico's Anti-Donation Clause enumerates the following entities: state, county, school district, and municipality. N.M. Const. art. IX, § 14. SFCC asserts that it is either a state institution or a school district.

A review of New Mexico case law indicates SFCC is not a state institution. In *Leach v. New Mexico Junior College*, the New Mexico Court of Appeals held that the New Mexico Junior College was not subject to Eleventh Amendment immunity as an arm of the state because it is not designated as a state education institution in Article 12, Section 11 of the New Mexico Constitution. 2002-NMCA-039, ¶¶ 14, 18, 45 P.3d 46. Relying on this decision, the New Mexico

Attorney General issued an opinion in 2008 concluding that the omission of New Mexico Junior College from Article 12, Section 11 also means the school is not a state institution for purposes of the Anti-Donation Clause. Doc. 53-14. The Court recognizes that "Attorney General opinions and advisory letters do not have the force of law." *United States v. Reese*, 2014-NMSC-013, ¶ 36, 326 P.3d 454. The 2008 Attorney General opinion, however, presents facts similar to the present case and is persuasive.

Nonetheless, SFCC urges the Court to look to a different, earlier New Mexico Attorney General Opinion. In 1997, the New Mexico Attorney General considered whether the Anti-Donation Clause barred the Albuquerque Technical-Vocational Institute from engaging in certain expenses, such as travel for speakers at the school, scholarships, and refreshments at graduation. N.M. A.G. Op. No. 97-02 (Jan. 7, 1997), 1997 WL 401040. The Opinion concluded, "based on the intent underlying the antidonation clause we believe that T-VI may constitutionally spend public money to achieve its educational purposes and perform its statutory functions, even when the expenditures provide an incidental benefit to private individuals or entities, as long as the benefit, based on the amount, duration, frequency or other characteristic, does not amount to an actual grant or subsidy condemned by the clause." *Id*. at *3. Regarding scholarships, "[t]he antidonation clause is not implicated because, as discussed above, the resulting benefit to students consists of a recognized governmental service, i.e., education." *Id*. at 5. Importantly, this 1997 Attorney General Opinion never explicitly addressed the issue before the Court: whether a community college is an arm of the state for purposes of the Anti-Donation Clause. Instead, the Opinion assumed the Anti-Donation Clause applied but then concluded that that the expenditures at issue did not violate the clause. In contrast, the 2008 Attorney General Opinion explicitly

considered whether the Anti-Donation Clause applies to a community college and concluded that it does not.

Between the 1997 and 2008 opinions from the New Mexico Attorney General, the 2008 opinion is more useful. It explicitly addresses the issue before the Court, takes the New Mexico Court of Appeals' 2002 decision in *Leach* into consideration, and is the most recent statement from the Attorney General on the issue. Like the New Mexico Attorney General, the Court concludes SFCC is not a state institution governed by the Anti-Donation Clause because it is not listed as a state education institution under the New Mexico Constitution, Article 12, Section 11.

Turning to the question of whether SFCC is a "school district", the Court first looks to New Mexico statutes. Under NMSA § 22-1-2(R), a school district is defined as "an area of land established as a political subdivision of the state for the administration of public schools and segregated geographically for taxation and bonding purposes." NMSA § 22-1-2(R). A public school is further defined as "part of a school district that is a single attendance center in which instruction is offered by one or more teachers and is discernible as a building or group of buildings generally recognized as either an *elementary, middle, junior high or high school* or any combination of those and includes a charter school." NMSA § 22-1-2(L) (emphasis added).

SFCC, on the other hand, is a community college organized under the Community College Act and governed by a community college board, NMSA §§ 21-13-1 to -25. Doc. 68 at 9. In contrast to a school district, a community college district is defined as "a district in which a community college is located, which district is composed of the territory of one or more school districts of the state." NMSA § 21-13-2(B). This definition indicates that the boundaries of a community college district are the same as the school district or school districts in which the community college is located. But the existence of common boundaries does not mean that the

state treats a community college district the same as a school district. Moreover, even if a community college district were the same as a school district, the campuses of an individual college, such as SFCC, are much smaller than the district in which it lies. Thus, even if a district at any given time is composed of only one school, that one school is not tantamount to an entire *district*. *See* NMSA § 22-1-2(L) (defining a public school as "*part of* a school district" (emphasis added)).

In short, SFCC has no explicit language from state law on which it can rely. Faced with the absence of such explicit language, SFCC argues that the intent of the New Mexico State Legislature is apparent based on what it did not say. SFCC points to NMSA § 21-13-2(B)(4), which provides that community colleges and community college districts "shall not . . . be considered school districts insofar as the restrictions [on school district indebtedness] of Article 9, Section 11 of the constitution of New Mexico are concerned." NMSA § 21-13-2(B)(4). SFCC argues: "that the legislature expressly exempted community colleges from status as a school district for purposes of one section of the New Mexico Constitution is evidence that the legislature intended community colleges to be school districts with respect to other constitutional provisions, including the Anti-Donation Clause." Doc. 68 at 9-10. In other words, SFCC argues that this example demonstrates that when the New Mexico Legislature wants to exempt community colleges from a section of the New Mexico Constitution, it will make that exemption express; conversely, silence on the issue indicates inclusion.

As an initial matter, the Court notes SFCC's argument fails to recognize that the state legislature provided *separate* definitions for school districts and community college districts. If the state legislature had intended school districts and community college districts to be the same

for other purposes of the state constitution, one would not expect those terms to be defined separately.

More importantly, having separately defined "school district" and "community college district", the decision to include "school district" but not "community college district" in the Anti-Donation Clause is significant. "Interpretation of constitutional clauses begins with the language of the text. Where the constitutional clause is clear and unambiguous on its face, courts will not construe the clause." *See State v. Lynch*, 2003-NMSC-020, ¶ 15, 74 P.3d 73. Here, the Anti-Donation Clause unambiguously includes the term "school district" and unambiguously excludes the term "community college district." Given that the state legislature chose to separately define "school district" and "community college district" and then chose to enumerate only "school district" in the Anti-Donation Clause, the Court will not read into that Clause an additional enumeration the state legislature could have, but did not, include. *See State ex rel. Stratton v. Roswell Indep. Sch.*, 1991-NMCA-013, ¶ 23, 806 P.2d 1085 ("When the [New Mexico] constitution either grants or prohibits certain powers, the affected subdivisions are specifically enumerated.").

SFCC also argues that it is subject to the Anti-Donation Clause as either a state institution or a school district because it receives public funding. Doc. 61 at 21. This funding argument cuts both ways, however. One difference between the elementary, middle, junior high, and high schools that comprise a school district and a community college is that a community college collects tuition payments from its students. Thus, schools that comprise a school district under NMSA § 22-1-2(L) provide free, legally mandated education that is completely subsidized by the government. In contrast, community colleges provide non-mandatory education subsidized in part by student tuition payments. Doc. 61 at 7. Thus, even though, as SFCC points out, at least 80

percent of its funding comes from public sources, that it charges its students tuition is another factor that distinguishes it from the schools § 22-1-2(L) enumerates as comprising a school district.

Moreover, concluding that SFCC is subject to the Anti-Donation Clause because it receives public funds would extend the Anti-Donation Clause far beyond the entities enumerated in the Clause. Again, in deciding the meaning of the Clause, the Court looks to its plain language and is not inclined to expand the Clause beyond the entities specifically enumerated within it. The New Mexico Attorney General's past treatment of a watershed district, a political subdivision of the state, provides support for this position. In 1993, the New Mexico Attorney General concluded that a watershed district is excluded from the Anti-Donation Clause because it is not one of the political subdivisions specifically enumerated in the Clause. Doc. 53-13 at 2 n.3 (Feb. 4, 1993 Attorney General of New Mexico opinion).

Nor do the cases SFCC cites convince the Court that it falls under the enumerated entities in the Anti-Donation Clause. SFCC argues that the New Mexico Constitution should be interpreted to address the evils the Anti-Donation Clause is intended to correct: "the investment of public funds in private enterprises." Doc. 61 at 19 (citing N.M. Att'y Gen. Op. No. 92-03 (May 5, 1992)). As such, SFCC cites several cases in which, it argues, New Mexico courts have applied the Anti-Donation Clause to "entities not specifically enumerated in the text." Doc. 61 at 20. For example, it cites *Village of Deming v. Hosdreg Co.*, in which the New Mexico Supreme Court applied the Anti-Donation Clause to the Village of Deming. 1956-NMSC-111, ¶¶ 31-32, 303 P.2d 920. It argues that the court "broadly defined a 'municipality' to mean a 'municipal subdivision' and included the Village of Deming in such definition, despite the fact that 'village' is not enumerated in the Anti-Donation Clause's text." Doc. 61 at 20. Under state statute,

however, a municipality is defined as "any incorporated city, town or *village* . . . ." NMSA § 3-1-2(G) (emphasis added). The *Village of Deming* court, therefore, was not broadly defining municipality to include entities not enumerated in the text; instead, in concluding that a village was a type of municipality, it was simply applying the statutory definition of "municipality." Unlike the situation in *Village of Deming* where the state legislature declared a village to be a type of municipality, the state legislature has never declared that a community college is a school district.

Next, SFCC cites *National Union of Hospital Employees v. Board of Regents*, in which the New Mexico Court of Appeals found that the University of New Mexico Hospital was subject to the Anti-Donation Clause. 2010-NMCA-102 ¶¶ 37-40, 245 P.3d 51. SFCC again reads this as expanding the Anti-Donation Clause since "university hospital" is not an enumerated entity. Doc. 61 at 20. However, the University of New Mexico is listed under Article XII, Section 11 and so, as a state education institution, is an enumerated entity. Its teaching hospital is part of that state education institution and so is simply a component of an enumerated entity.

The other cases SFCC cites likewise deal with application of the Anti-Donation Clause to enumerated entities. *See Kennecott Copper Corp. v. Town of Hurley*, 1973-NMSC-032, ¶ 1, 507 P.2d 1074 (applying the Anti-Donation Clause to a town, which falls under the definition of municipality); *Chronis v. State ex rel. Rodriguez*, 1983-NMSC-081, ¶ 30, 670 P.2d 955 (applying the Anti-Donation Clause to a subsidy given by the state); *White v. Bd. of Educ. of Silver City*, 1938-NMSC-009, ¶¶ 28-30, 75 P.2d 712 (applying the Anti-Donation Clause to a school district).

In sum, SFCC is not subject to the Anti-Donation Clause because it does not fall under the enumerated entities. Because the Court finds that SFCC is not subject to the Anti-Donation

Clause, it need not address whether the Anti-Donation Clause requires fair market value for the lease agreements. The Court grants summary judgment in favor of Ztark on SFCC's request for declaratory judgment that the renewal provisions of the capacity lease agreements cannot be enforced against SFCC because enforcement would be unconstitutional.

### 2. The lease agreements are not unconscionable.

In its amended complaint, SFCC seeks a declaration that the capacity lease agreements cannot be enforced against SFCC because they are unconscionable. "Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Cordova v. World Finance Corp. of N.M.*, 2009-NMSC-021 ¶ 21, 208 P.3d 901. "Unconscionability is a legal question." *Dalton v. Santander Consumer USA, Inc.*, 2016-NMSC-035, ¶ 6, 385 P.3d 619. Further, it "is an affirmative defense to contract enforcement, and under settled principles of New Mexico law, the party asserting an affirmative defense has the burden of proof." *Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 3, 304 P.3d 409.

SFCC does not assert that the lease agreements are procedurally unconscionable, i.e., that circumstances surrounding the formation of the contracts were unconscionable. *See* Doc. 61 at 26-28; *Cordova*, 2009-NMSC-021, ¶ 23. As such, the Court will analyze this issue under the doctrine of substantive unconscionability.[8] "Substantive unconscionability concerns the legality and fairness of the contract terms themselves." *Cordova*, 2009-NMSC-021, ¶ 22. That is, "[t]he substantive analysis focuses on such issues as whether the contract terms are commercially

---

[8] "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." *Cordova*, 2009-NMSC-021, ¶ 24.

reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns." *Id.* "Contract provisions that unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 25. Said another way, "substantive unconscionability broadly refers to whether the material terms of a contract are patently unfair and more beneficially one-sided in favor of the more powerful party." *Ruppelt v. Laurel Healthcare Providers, LLC*, 2013-NMCA-014, ¶ 18, 293 P.3d 902. "Thus, substantive unconscionability can be found by examining the contract terms on their face." *State ex rel. King v. B & B Inv. Grp., Inc*., 2014-NMSC-024, ¶ 32, 329 P.3d 658.

In this case, SFCC argues that the lease agreements are unconscionable for two reasons. First, SFCC argues the lease agreements were unconscionable when they were signed because they lacked consideration. Doc. 61 at 26. That is, SFCC says the leases included fee provisions for $40,000 and $65,000, but Ztark has never paid either.[9] Although SFCC frames this as an issue with the contract on its face, *id.* ("the leases were unconscionable at the time they were signed"), SFCC focuses on conduct *subsequent to* the signing of the lease agreements, *id.* at 27 (discussing Ztark's subsequent failure to pay the lease fees, install equipment, and use the excess capacity and its misrepresentations regarding the status of the arrangement).

The Court does not find that the lease fee provisions make the lease agreements substantively unconscionable. First, even assuming SFCC has never received the bargained-for consideration under the lease agreements, such an argument is better framed as a breach of contract or enforcement action, not as an action to void the agreement as unconscionable. Ztark's subsequent failure to pay the lease fees does not mean the lease agreements were unconscionable

---

[9] Ztark did, however, pay $95,000 on behalf of SFCC to CSF when CSF transferred its license to SFCC, which the parties agreed would satisfy Ztark's lease fee obligation under the lease agreement originally with CSF. UMF No. 19; Doc. 61 at 5 ¶ 19.

on their face; it means (at most) that Ztark simply breached a contract. Additionally, the fee provisions do not unreasonably benefit one party. Although Ztark does not have to pay the lease fees until it receives FCC approval of the leases, Ztark also does not have the right to use the excess capacity until it receives FCC approval. This is not the type of one-sided agreement New Mexico courts have found unconscionable. *See Cordova*, 2009-NMSC-021, ¶ 1 (finding an arbitration provision used by a small loan company inherently one-sided because it required the borrower to submit claims to arbitration but allowed the lender the option of litigating the type of claim it was most likely to seek against the borrower); *Rivera v. Am. Gen. Fin. Serv.*, 2011-NMSC-033, ¶¶ 53-54, 259 P.3d 803 (finding an arbitration clause unconscionable that encompassed any and all claims the borrower could have against the lender but exempted certain claims the lender might have against the borrower).

Further, the 2006 lease agreements call for a *one-time* lease payment. Ztark indisputably has never made the $40,000 lease payment described in the 2006 lease agreement between Ztark and SFCC. But Ztark points out that, because the FCC never approved the lease agreement, this payment has never come due. It argues that it has always stood ready to make this $40,000 payment once the predicate FCC approval has been obtained. Ztark further points out that, in 2020, it sought SFCC's cooperation to obtain FCC approval, at which time it planned on making the $40,000 payment called for under its lease agreement with SFCC. SFCC does not dispute this; instead, it points out that the lease agreement called for "timely" FCC approval and asserts that the one-time payment, coming toward the end of the fifteen-year lease term, would be unconscionably late. The Court finds that SFCC's receipt of the consideration it negotiated for (the one-time payment) at the end, rather than beginning, of the lease term does not make the contract unconscionable at its inception.

In making this conclusion, the Court points out that SFCC's unconscionability argument is not premised on the lost use of this one-time $40,000 payment. Rather, SFCC's argument is that the untimely consummation of the lease agreements and the renewal provision of the lease agreements are unconscionable because they do not account for the change in the value of the licenses. Doc. 61 at 27. For a court to hold that a contract is substantively unconscionable, the court must conclude that one or more of the contract's terms was grossly unfair "at the time the contract was formed." *Guthmann v. LaVida Llena*, 1985-NMSC-106, 709 P.2d 675 (disapproved of on other grounds by *Cordova*, 2009-NMSC-021). The renewal provisions were not unconscionable at the time they were executed because both sides, who were represented by legal counsel, accepted the risks and benefits associated with the unknown future value of the licenses. At the time the contracts were formed, neither party could predict the future value of the licenses with certainty. That the market value of the licenses significantly increased after the parties entered their contracts does not mean the agreements were unconscionable on their face when executed.

An analogous case is *Guthmann*, 1985-NMSC-106. In that case, Kathleen MacKay, then 79 years old, executed a Residence Agreement with La Vida Llena retirement center. *Id.* ¶¶ 1-2. Under that agreement, she paid a non-refundable entry fee of $36,950 to occupy a one-bedroom unit for the rest of her life. *Id.* ¶ 4. Ms. MacKay died roughly 6 months after moving in. *Id.* ¶ 2. Her estate argued that the no-refund clause of the agreement was substantially unconscionable. *Id.* ¶ 23. The court disagreed.[10] It held that "a contract that does not violate public policy is not

---

[10] In laying out the law on substantive unconscionability, the *Guthmann* court held that "[t]he terms must be such as no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Id.* ¶ 23 (internal quotation marks and citation omitted). The New Mexico Supreme Court later specifically disapproved of the use of

unconscionable unless one or more of its terms is grossly unfair under the circumstances *as they existed at the time the contract was formed*." *Id.* ¶ 24 (emphasis added). In that case, the court found that the plaintiff's argument for unconscionability rested on an event that occurred subsequent to the agreement—Ms. MacKay's unexpected death—and such an event did not render the agreement unconscionable. *Id.* Here too, at the time the parties executed the lease agreements, the renewal provisions were not grossly unfair as the gap between the market value of the license and the amount Ztark agreed to pay to lease those license only became apparent in later years, due to changes in the market.

In sum, looking at the circumstances as they existed when the parties executed the 2006 lease agreements, the Court finds nothing to show that the lease agreements were unconscionable on their face. Accordingly, the Court grants summary judgment in Defendant Ztark's favor on Plaintiff SFCC's claim that the lease agreements are unconscionable.

### 3. Even if Ztark failed to timely seek FCC approval, SFCC never gave Ztark notice of the breach and an opportunity to cure.

In the Amended Complaint, SFCC alleges that

> The Capacity Lease Agreements were never consummated and therefore are not enforceable. The parties were required to cooperate to timely submit applications to the FCC for approval of the Leases. This was never done. At this point, nearly fifteen years later, a timely application is not possible. As a result, Ztark never had the right to use and never actually used the 95% as the Capacity Lease Agreements state. Ztark also never paid a Lease Fee to SFCC. This is all consistent with a track record of poor or no performance of the obligations under the Leases.

---

this standard. *Cordova*, 2009-NMSC-021, ¶ 31. As is relevant to this case, the *Guthmann* court went on to consider whether the terms of the contract were grossly unfair as they existed at the time of the contract. 1986-NMSC-106, ¶ 24. This Court thus declines to follow the language disapproved of by the New Mexico Supreme Court, but still finds value in *Guthmann*'s other statements of law and subsequent analysis.

Doc. 35 at 8. Accordingly, SFCC seeks a declaration from the Court that "the Capacity Lease Agreements cannot be enforced against SFCC because the FCC has never approved them." *Id.* at 9. Ztark moves for summary judgment on this issue. In general, it argues that the terms of the Capacity Lease Agreements still can, and still should, be enforced. It asserts that the parties entered into a valid contract that has never been breached and so remains viable. And, if there was a breach, Ztark continues, that breach was mutual and so waived. Finally, even if the breach was not mutual, Ztark argues that the breach did not invalidate the contract because SFCC never provided Ztark notice of the breach and an opportunity to cure it, as the contract requires. In response, SFCC asserts several different arguments. The Court addresses the parties' arguments in turn.

      a.   Whether the lease agreements are invalid because the broadband spectrum capacity was unlicensed at time of contract formation is not part of SFCC's request for declaratory judgment.

As an initial matter, SFCC briefly makes an argument that the 2006 lease agreements were never valid because they sought to lease broadband spectrum capacity for which SFCC and CSF did not have licenses.[11] Specifically, in a footnote, SFCC explains that

> questions remain regarding whether the 2006 lease negotiation ever ripened into a valid agreement under New Mexico law. Rather than wait until the Licenses were reinstated and renewed, which did not occur until 2009[,] Ztark and SFCC and CSF almost immediately executed the form Capacity Lease Agreements. (AMF 3.) Thus, the Agreements were signed prematurely, prior to the FCC granting SFCC and CSF renewal of their Licenses. (See AMF 2-4, 12, 16.)

Doc. 61 at 28 n.4. The only reference to this argument in SFCC's complaint appears in the general factual allegations: "[I]n May 2006, Ztark also executed two Leases, one with SFCC and

---

[11] A license to use broadband spectrum is different than a lease of that license. The facts are undisputed that the FCC reinstated the licenses at issue here in 2009—three years after the lease agreements were entered. AMF Nos. 3, 9.

one with CSF, even though at that time, neither of the Licenses had been reinstated and renewed." Doc. 35 ¶ 16.

This argument diverges from the declaratory relief SFCC seeks: that "the Capacity Lease Agreements cannot be enforced against SFCC because the FCC has never approved them." Doc. 35 at 9. In other words, SFCC does not seek a declaration that the lease agreements cannot be enforced against it because the parties could not validly contract to lease broadband spectrum capacity before possessing FCC-approved licenses to use that capacity. Because SFCC does not seek a declaratory judgment on this issue, Ztark did not move for summary judgment on it and the Court will likewise not consider it.

      b.  <u>FCC lease approval relates to performance, not formation, of the contract.</u>

As a result, the Court turns to the relief that SFCC does seek: a declaration that the lease agreements cannot be enforced against it because the FCC never approved the leases. Doc. 35 at 9. SFCC first argues that the agreements were never consummated because the FCC never approved them. Although not entirely clear in the complaint, SFCC appears to be asserting that the 2006 lease agreements were never valid, and therefore are not enforceable against it, because the requirement to seek FCC approval of the leases was a condition precedent to the lease agreements being in effect. *See* Doc. 35 at 8 ("The Capacity Lease Agreements were never consummated and therefore are not enforceable. The parties were required to cooperate to timely submit applications to the FCC for approval of the Leases. This was never done."). In its summary judgment motion, Ztark argues the "agreements plainly reflect that the parties understood that they became effective in 2006, and the FCC lease approval was part of the performance of the Agreements as opposed to a condition precedent to their effectiveness." Doc. 53 at 21. SFCC does not respond to this argument in its response brief, where it argues only that

SFCC breached the lease agreements by failing to seek FCC approval. Nonetheless, because Plaintiff raised this issue in its Complaint and Defendant addressed it in its brief, the Court also briefly addresses it.

FCC lease approval was not a necessary condition precedent to contract formation. The lease agreements, by their express terms, contain an effective date in May 2006 and Section 1(a) provides that: "The term of this Agreement shall commence upon the date hereof ('Commencement Date'). The term shall continue from the Commencement Date, unless this Agreement is otherwise terminated as provided in Section 7, for a period of fifteen (15) years subject to the renewal of the FCC License ('Initial Term')." Doc. 53-5 at 1; Doc. 53-6 at 1. Additionally, Section 7(a) allows Ztark, but not SFCC, to terminate the agreement "in the event the FCC approval has not occurred within twelve (12) months from the date of execution of this Agreement." Doc. 53-5 at 6; Doc. 53-6 at 6. This provision only makes sense if the lease agreements became effective when signed and FCC approval was part of the parties' required performance under the agreements. Reviewing these provisions, the Court finds that Ztark has established through undisputed facts that FCC approval was a part of the parties' performance under the lease agreements, not a condition precedent which, if not completed, meant the agreements were never consummated. SFCC fails to present any facts to dispute this and as such the Court grants summary judgment in Ztark's favor as to the claim that the lease agreements were never consummated.

c.  A genuine issue of material fact exists as to whether Ztark failed to comply with the
    contractual provision to timely seek FCC lease approval.

Turning to SFCC's principal argument, breach of contract, SFCC focuses on two ways it asserts that Ztark breached the lease agreements:[12] (1) Ztark never secured timely FCC approval; (2) Ztark never paid the lease fees. Doc. 61 at 29-30.

SFCC's second argument is easily resolved. Section 5 of the lease agreements provides that Ztark does not have to pay the lease fees until after the FCC approved the leases. UMF No. 9; *see also* Docs. 53-5 at 5, 53-6 at 4. Because the FCC has not yet approved the lease agreements, Ztark has not breached this provision to pay the lease fees.

Thus, SFCC's better argument is its first one: Ztark breached its contractual duty to timely seek FCC lease approval. Section 4(c) of the lease agreements provides that "[t]he parties agree to cooperate to prepare and file with the FCC all applications, forms, related exhibits, certifications and other documents necessary to obtain the FCC's consent to this Agreement and satisfy the FCC's requirements for long term de facto lease approval." Docs. 53-5 at 5, 53-6 at 4. That section further provides that the FCC applications should be submitted "timely." *Id.*

Given these provisions, the Court must first ask: what is considered "timely" under the lease agreements for purposes of submitting the FCC applications? The plain language of the contracts requires the parties to "timely" submit an FCC applications, which to date, neither party has.[13] Because Ztark has not yet submitted FCC applications, has it breached the

---

[12] SFCC more briefly alleges two other breaches, which are unrelated to its request for declaratory judgment and which the Court addresses later.

[13] As discussed in the Order on Plaintiff's Motions for Summary Judgment, it is undisputed that Ztark sought SFCC's cooperation in 2020 to take steps Ztark considered necessary to apply for FCC approval. Thus, in analyzing whether a factual dispute exists as to whether Ztark failed to

agreements to timely submit applications, and therefore breached the agreement to pay the lease fees such that the lease agreements cannot be enforced against SFCC?

The parties agree that the lease agreements do not set a definite date by which FCC applications need to be submitted, and FCC regulations do not contain a deadline. What then, does "timely" mean? Ztark and SFCC provide different definitions. SFCC measures "timely" by referencing the amount of time passed since the parties executed the lease agreements. The parties executed the lease agreements in 2006 and never sought FCC approval for at least the first 14 years of the initial term of the lease agreements. SFCC argues that the passage of 14 years means Ztark failed to timely seek FCC approval, which is a material breach of the lease agreements. Doc. 61 at 29. Further, SFCC argues, this time having passed, it is now impossible to "timely" seek FCC approval. *Id.* at 31.

Ztark argues that SFCC's measurement of "timeliness" fails to take into consideration other transactions between the parties. For instance, it points out that SFCC's and CSF's petitions to reinstate their licenses were pending with the FCC between 2006 and 2009; thus, FCC approval of the lease agreements was not possible before 2009. Doc. 76 at 7. Then, between 2009 and 2011, the parties focused on transferring CSF's license to SFCC. *Id.* In 2011, the parties began discussions to sign new lease agreements that the parties would submit for FCC approval instead of the 2006 agreements. *Id.* The "signing of the new agreements and follow-up application for FCC approval slipped through the cracks, and neither party brought the issue up again until SFCC filed its lawsuit last October." *Id.* at 7-8. Around the same time in 2011, Ztark worked to satisfy the FCC's substantial service construction requirement. *Id.* at 7. In sum, Ztark

seek FCC approval in a timely manner, the Court does not factor the time period after 2020 into the Court's analysis.

argues that, given the transactions that occurred between the parties, it did not make sense to file FCC applications and so its failure to submit applications to date is not untimely. Indeed, it also argues that "there was no market for broadband spectrum until very recently; while Ztark was obligated to install equipment for the schools and otherwise perform under the Agreements, it did not need to undertake the effort to obtain FCC approval of the leases until it could make use of them." Doc. 53 at 17. Ztark's argument demonstrates that a factual dispute exists as to whether FCC approval could be "timely" obtained in 2020 or later. Given the existence of this factual dispute, Ztark's path to summary judgment can only proceed through one of Ztark's other arguments.

One of these arguments is that the parties *shared responsibility* for submitting the FCC applications. Ztark points to Section 4(c) of the agreements, which provides that "[t]he parties agree to *cooperate* to prepare and file with the FCC all applications, forms, related exhibits, certifications and other documents necessary to obtain the FCC's consent to this Agreement . . . ." Docs. 53-5 at 5, 53-6 at 4 (emphasis added). It argues that SFCC also failed to submit the FCC applications and "SFCC's nonperformance relieves Ztark of its duty to perform its reciprocal obligation." Doc. 53 at 18. SFCC, on the other hand, argues that, even if it was required to cooperate, its lack of cooperation in submitting FCC applications should be excused because it is not now possible to submit timely applications. Doc. 61 at 31. SFCC also points to emails from 2011 in which it prompted Ztark multiple times to finalize new agreements and secure FCC approval. Doc. 61 at 31. However, the emails also show that Mr. Kratz was waiting to hear back from Jean Moore (on behalf of SFCC) before seeking FCC approval and did not receive a response.

SFCC further argues that, under the 2011 MOU, Ztark "took on the responsibility of securing FCC approval," because that agreement states that Ztark will "secure FCC approval of the Capacity Lease Agreements in accordance with the provisions of the capacity Lease Agreements." Doc. 61 at 29; *see also* Doc. 53-9 at 1. Ztark asserts that this provision from the 2011 MOU referred to the new lease agreements that the parties negotiated but never executed; therefore, the 2006 lease agreement provision for the parties to cooperate on FCC approval remained in effect. The most natural reading of the 2011 MOU favors Ztark's position. That is, the 2011 MOU introduction references Capacity Lease Agreements that the parties "have agreed to enter," which likely refers to the lease agreements the parties negotiated between 2009 and 2011 but never executed. Doc. 53-9 at 1. Commensurately, Section 3's reference to Ztark seeking FCC approval of the Capacity Lease Agreements likely refers to the same unexecuted lease agreements, not the 2006 lease agreements. *See id.* Additionally, Section 4(b) provides that: "Nothing in this Memorandum of Understanding alters any provisions . . . of the form Capacity Lease Agreements to which the Parties have previously agreed, or of any other agreements between SFCC and Ztark." *Id.* at 2. This section seems to confirm that the provisions of the 2006 lease agreements (including the provision to cooperate on seeking FCC approval) remain unchanged.

On the other hand, the 2011 MOU does not explicitly state to which lease agreements it is referring. Drawing all reasonable factual inferences in favor of SFCC (as the non-moving party), a reasonable fact-finder could conclude that the 2011 MOU's ambiguous reference to "the Capacity Lease Agreements" referred to the 2006 agreements already in place. Such a conclusion could then lead to the additional conclusion that the 2011 MOU altered the 2006 lease agreements such that Ztark then carried sole responsibility to seek FCC approval.

In sum, the Court finds that disputes of material fact exist as to: (1) what constitutes "timely" for purposes of seeking FCC approval of the 2006 lease agreements and (2) whether, after 2011, it was Ztark's responsibility to submit FCC applications. Accordingly, a factual dispute exists as to whether Ztark violated a contractual duty to timely seek FCC approval of the 2006 lease agreements.

d. <u>Even assuming Ztark failed to comply with an obligation to timely seek FCC lease approval, such noncompliance does not constitute a breach of contract because SFCC provided no notice and opportunity to cure.</u>

Normally, this would end the Court's inquiry and prompt a denial of summary judgment. However, Ztark argues, even assuming it carried sole responsibility for seeking FCC approval and it violated the lease agreements by failing to seek such approval, the Court should grant summary judgment in its favor because SFCC never gave Ztark notice of the breach and an opportunity to cure, as the lease agreements required. Doc. 53 at 19.

Under Section 7(c), either party may terminate the agreements "upon Material Breach or default by the other Party of its duties and obligations hereunder," after first giving notice to the defaulting party. UMF Nos. 13, 14.

> A Party terminating this Agreement for Material Breach shall first notify, in writing, the defaulting Party of the basis for such termination and the defaulting Party shall have thirty (30) days from receipt of such notice from the non-defaulting party to cure the Material Breach. If such Material Breach cannot be cured with thirty (30) days, Lessee shall have taken such necessary steps to commence and diligently pursue the cure of the Material Breach. If the cure period lapses and the defaulting Party has yet to commence or diligently pursue the cure of the Material Breach, this Agreement shall automatically terminate.

UMF No. 14. Here, Ztark asserts, and SFCC does not dispute, that prior to filing its complaint, SFCC never notified Ztark of any material breach, giving Ztark no opportunity to cure as

required under the lease agreements.[14] UMF No. 25; Doc. 61 at 6 ¶ 25 ("Until it filed its complaint in this action, SFCC never complained about Ztark's performance of its obligations under the Lease Agreements, including but not limited to seeking FCC approval of the Lease Agreements or paying the lease fees."); UMF No. 28; Doc. 61 at 7 ¶ 28 ("At no time prior to filing its complaint in this action did SFCC ever formally or informally notify Ztark, in writing or otherwise, of any default or breach of any obligation under the terms of the Lease Agreements and that the Lease Agreement would terminate unless Ztark cured the default within thirty days, or that the Agreements were not valid.").

Instead, SFCC argues that Ztark cannot "timely" obtain FCC approval, so there is no way for Ztark to cure the breach. Whether Ztark *in 2020* (when SFCC filed this lawsuit) could no longer "timely" obtain FCC approval, however, does not bear on Ztark's argument: SFCC could have, but did not, provide Ztark notice and an opportunity to cure *at the point SFCC claims Ztark breached the agreements*. Had SFCC done so, Ztark could have cured the breach even under SFCC's definition of timely.

SFCC's explanation for its failure to provide Ztark notice of breach and an opportunity to cure is that, starting in 2015, Mr. Kratz misled Mr. Telles (SFCC's new CFO) regarding the history between the parties and that Ztark provided SFCC incomplete, inaccurate, and misleading information in the months leading up to the lawsuit. SFCC claims this prevented it from determining which agreements had been executed, whether the agreements had FCC approval, what equipment Ztark installed, whether SFCC had received a lease fee, and which provisions of

---

[14] For the first time at oral argument, SFCC asserted that the complaint itself was notice and an opportunity to cure. Both the complaint and amended complaint, however, seek a declaration that the lease agreements are unenforceable because the FCC never approved them. Doc. 1-1 at 7; Doc. 35 at 9. Plaintiff does not explain how its complaint constitutes an opportunity to cure.

the lease agreements had been performed. SFCC, however, presents no argument or authority to establish that Ztark had a duty to correct SFCC's understanding of contracts that it has been a party to since the contracts' inception.[15] Moreover, even if Mr. Kratz's communications with Mr. Telles did excuse SFCC's failure to provide notice of breach and opportunity to cure as of 2015, it remains undisputed that since at least 2011 SFCC was aware that Ztark had not submitted the FCC applications.[16] Not having notified Ztark that it considered it to have breached the agreement by not seeking FCC approval, and not having given Ztark an opportunity to cure this breach, SFCC cannot successfully argue that Ztark breached the lease agreements.

Because it is undisputed that before filing its lawsuit SFCC never gave Ztark notice of its alleged breach and an opportunity to cure as required by the lease agreements, the Court grants summary judgment in Ztark's favor as to SFCC's request for declaratory judgment that the lease agreements are unenforceable because Ztark never sought FCC approval.

---

[15] To be precise, SFCC has been a party to one of the 2006 lease agreements since its inception. It was not party to the 2006 agreement between Ztark and CSF. However, the relevant language of both lease agreements is the same and CSF transferred its license agreement to SFCC a few years after its execution.

[16] Ztark points to the emails exchanged between the parties in 2011 in which Jean Moore asked about FCC approval and asserts that, if SFCC attempts to argue that those emails constitute notice and an opportunity to cure, then "any attempt in 2020 to obtain a judicial determination that the Agreement is terminated based on Ztark's failure to obtain FCC approval would be barred by the statute of limitations." Doc. 53 at 20. Ztark did not include this defense in its answer and so filed a motion to amend to add an affirmative defense that SFCC's claims are barred by the applicable statute of limitations. Doc. 67. The Court grants that motion in a contemporaneously filed Order. However, in the present Order, the Court finds Ztark's statute of limitations argument moot because SFCC does not argue that the 2011 emails were notice and an opportunity to cure. Instead, it is undisputed that before filing its lawsuit SFCC never provided Ztark with notice of alleged breaches and an opportunity to cure. UMF No. 25, 28.

e.   SFCC's other arguments are unrelated to its request for declaratory judgment.

SFCC raises other arguments that are unrelated to its request for declaratory judgment

that the lease agreements cannot be enforced against it because the FCC never approved them.

First, SFCC argues that Ztark breached the lease agreements by failing to use the 95% excess

capacity, allowing it "to lay fallow in contravention of the core purposes and intent of the Leases

and public policy." Doc. 61 at 30. By not using the excess capacity, SFCC argues that Ztark

abandoned the lease agreements. Doc. 61 at 35. Ztark counters that "SFCC has never pled a

claim that [Ztark] abandoned the 2006 lease agreements" (Doc. 76 at 13), and the Court agrees.

Whether Ztark failed to use the excess capacity during the lease term does not relate to whether

the lease agreements are unenforceable because Ztark never sought FCC approval. As such, the

Court will not address SFCC's abandonment argument. Likewise, whether Ztark breached the

lease agreement by failing to use the excess capacity is not related to whether Ztark failed to seek

FCC approval, and is therefore not related to SFCC's request for declaratory judgment.

Second, SFCC argues that although Ztark constructed some transmission facilities, that

construction was minimal and significantly delayed, and such minimal and delayed construction

is a breach of the lease agreements. But again, construction of facilities is not related to whether

Ztark failed to seek FCC approval, and is therefore not related to SFCC's request for declaratory

judgment. Even if the Court were to allow such an unpled claim to proceed, however, it would

fail because it is undisputed that SFCC never gave Ztark notice of a breach of the lease

agreements regarding construction requirements and an opportunity to cure.

Next, SFCC argues that "Ztark cannot now demand specific performance from SFCC to

cooperate with FCC Filings and Approval based upon the doctrine of unclean hands." Doc. 61 at

32. It explains that Ztark has unclean hands regarding the lease agreements it now seeks to

enforce: Ztark failed to secure FCC approval for the lease agreements, it failed to pay the lease fees, its construction of transmission facilities has been minimal and significantly delayed, and Mr. Kratz made several misrepresentations to SFCC representative, Mr. Telles. *Id.* at 32-33. As such, SFCC argues, Ztark's unclean hands bar specific performance.

The Court finds that this argument addresses an issue that is not before it in the present summary judgment motion. In the present motion, Ztark asks for summary judgment on SFCC's three declaratory judgment issues: (1) whether the lease agreements are unconstitutional under the Anti-Donation Clause; (2) whether the lease agreements are unconscionable; and (3) whether the lease agreements are unenforceable because the FCC never approved them. *See* Doc. 53 (Ztark's motion for summary judgment); Doc. 35 at 9 (amended complaint). A claim for specific performance is not in SFCC's complaint and Ztark did not move for summary judgment on it. Instead, Ztark filed a counterclaim, seeking in part specific performance for FCC lease approval, lease renewal, and assignment. Doc. 38 at 13. To obtain summary judgment on one of Ztark's counterclaims, SFCC would need to file its own summary judgment motion.

Similarly, SFCC asserts that "Ztark has ignored the existence of the leases it now seeks to enforce." Doc. 61 at 34. It explains that "[a]t various points in this business relationship, and when it benefited itself, Ztark has ignored the existence of the very Leases it now seeks to enforce." *Id.* at 35. To the extent SFCC is again trying to argue the Ztark cannot enforce the leases because of its actions (ignoring the existence of the leases while negotiating new leases), the Court finds that argument should be directed at Ztark's counterclaim for specific performance, which is not at issue in the present motion.

**CONCLUSION**

For these reasons, the Court GRANTS Ztark Broadband LLC's Motion for Summary Judgment (Doc. 53) as to all SFCC's claims for declaratory judgment and SFCC's Amended Complaint is DISMISSED.

_____
**STEVEN C. YARBROUGH**
**United States Magistrate Judge**
**Presiding by consent**