IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SANTA FE COMMUNITY COLLEGE,

      Plaintiff/Counter-Defendant,

vs.                                                   Civ. No. 20-1151 SCY/KK

ZTARK BROADBAND, LLC, a cancelled
California Limited Liability Company,

      Defendant/Counter-Plaintiff,

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO STRIKE

Plaintiff Santa Fe Community College ("SFCC") holds two valuable broadband spectrum licenses. Defendant Ztark Broadband, LLC ("Ztark"), however, claims it has leased those licenses and holds the exclusive right to renew the leases. SFCC acquired one of its two licenses from non-party College of Santa Fe ("CSF") in 2010. At the beginning of this case, the parties filed a Joint Status Report ("JSR") in which they stipulated: "The College of Santa Fe assigned its interest in its Capacity Lease Agreement with Ztark to [SFCC] as of March 10, 2010." Doc. 7 at 2 ¶ 3. A year and a half later, SFCC filed a notice correcting or withdrawing that stipulation to clarify that, although CSF transferred its license to SFCC in 2010, Ztark's lease on that license did not also transfer. Doc. 130. In response, Ztark filed the present "Objection to, and Motion to Strike, Plaintiff and Counter-Defendant Santa Fe Community College's 'Notice of Correction or Withdrawal of Stipulation.'" Doc. 135; *see also* Doc. 136 (response); Doc. 138 (reply).

SFCC's request to withdraw its stipulation is much more than a request to excise one sentence from the JSR. Granting SFCC's request likely would lead to amended counterclaims. And, even if Ztark did not amend its counterclaims, both sides agree that the stipulation withdrawal would lead to additional discovery and briefs related to a variety of legal issues.

Given that discovery closed on June 9, 2021 and dispositive motions were due by July 9, 2021 (Doc. 16), allowing for such additional discovery and briefing would require a drastic amendment to the Court's scheduling order. The justification for such a drastic amendment cannot be to open a path for SFCC to assert a legal theory that conflicts with a stipulation it entered before discovery and that it failed to identify until after the close of discovery, after the parties briefed dispositive motions, and after the Court dismissed SFCC's other claims. Accordingly, the Court will not allow SFCC to withdraw the stipulation and grants Ztark's motion to strike (Doc. 135).[1]

## PROCEDURAL AND FACTUAL BACKGROUND

In advance of a December 15, 2022 hearing on the present motion, the Court issued an Order setting the hearing and describing issues to be discussed at the hearing. Doc. 145. In the Order, the Court listed certain facts related to the at-issue stipulation that it understands to be undisputed. *Id.* at 2-4. At the hearing, the parties confirmed that these facts are undisputed, except where indicated. Doc. 148 at 3:23 to 4:4. For context, the Court repeats these facts.

In 1995, the FCC issued broadband spectrum licenses to SFCC and non-party College of Santa Fe ("CSF"). Doc. 116 at 3. SFCC and CSF forfeited those licenses in 2005 but the FCC reinstated and renewed them in June 2009. *Id.* In 2006, Ztark entered into two separate Capacity Lease Agreements ("CLA"), one with SFCC and one with CSF, where Ztark agreed to lease each school's excess broadband capacity for 15 years. *Id.*

In 2010, CSF sold its license to SFCC. *Id.* at 5. This sale was governed by a March 10 Asset Purchase Agreement ("APA") between CSF and SFCC. Doc. 53-8 at 1, 2, 5. "In

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 11, 12, 13.

consideration of the transfer by [CSF to SFCC] of the FCC License," SFCC agreed to pay CSF the purchase price of $65,000. *Id*. at 1 ¶ 1.1. Rather than SFCC providing these funds, however, Ztark agreed to "have delivered to [CSF] the Purchase Price on behalf of [SFCC], by wire transfer of immediately available funds." *Id*. at 5 ¶ 7.4.[2] Further, as part of the APA, Ztark agreed to "have delivered to [CSF] an additional payment of Thirty Thousand Dollars ($30,000) (the 'Additional Payment'), by wire transfer of immediately available funds." *Id*. ¶ 6.3. The parties do not dispute that Ztark did in fact pay CSF the $95,000 contemplated in the APA. *See* Doc. 131 at 9. CSF and SFCC agreed this payment would satisfy Ztark's lease fee obligation under its 2006 lease agreement with CSF.[3] Doc. 116 at 6.

Also on March 10, 2010, Ztark and SFCC entered an Agreement for the Transfer and Lease of License ("Transfer Agreement"). Doc. 53-7. As part of this agreement between Ztark and SFCC, "Ztark shall pay directly to [CSF], in immediately available funds, the Sixty-Five Thousand Dollar ($65,000) purchase price (the 'Purchase Price') for the transfer of the License from [CSF] . . . ." *Id*. at 1 ¶ 1. Further as part of the agreement, "From the date hereof, SFCC shall not enter into any agreement, understanding, or arrangement or commence any discussions, negotiations, or consultations with any third party with respect to the leasing of any excess

---

[2] The APA has a signature block for Ztark under the heading "<u>AGREED AS ITS INTERESTS AND OBLIGATIONS APPEAR</u>." The copy of the APA the parties cited when briefing summary judgment is not signed by Ztark, Doc. 53-8 at 8, but SFCC has since provided the Court with a copy of the signature page that includes Ztark's signature, Doc. 122-1.

[3] At the hearing, counsel for SFCC did not dispute this fact but pointed out that if "Ztark's lease obligations were indeed satisfied then the transfer of the entire lease would not have been appropriate. [It] would have been more along the lines of a partial assignment." Doc. 148 at 5:9-12; *see also id.* at 5:16-23.

capacity on the Channels without first obtaining the prior written consent of Ztark."[4] *Id.* ¶ 3. And, "When SFCC takes transfer of the License, SFCC and Ztark, or an affiliated or assigned entity of Ztark, agree to enter a Capacity Lease Agreement in exactly the form attached hereto as Appendix A for the lease of the excess capacity on the Channels." *Id.* ¶ 3.[5]

SFCC filed a declaratory judgment action on October 6, 2020, in which it asserted that neither lease is enforceable against it because renewal of the leases would violate the New Mexico Constitution, the leases were never consummated because the FCC never approved them, and the renewal provisions are unconscionable. Doc. 35 at 8 (amended complaint, asserting the same). At the start of the case, on December 1, 2020, the parties stipulated in the JSR that "[t]he College of Santa Fe assigned its interests in its Capacity Lease Agreement with Ztark to Plaintiff as of March 10, 2010." Doc. 7 at 2 ¶ 3. The Court adopted the JSR on December 11, 2020 as part of its Scheduling Order. Doc. 16.

At the very end of discovery, Ztark moved for summary judgment on SFCC's three requests for declaratory judgment. Doc. 53. In their briefing, both parties treated the two separate leases as one unit—i.e., they made arguments regarding whether Ztark could enforce both leases against SFCC without differentiating between the two. *See generally* Docs. 53, 61, 76. The Court granted Ztark's request for summary judgment as to all SFCC's claims for declaratory judgment. SFCC then filed a Motion to Reconsider, and at that time, it alleges that the stipulation in the JSR came to its attention. Doc. 136 at 1-2. As such, on April 26, 2022, SFCC filed a "Notice of

---

[4] At the hearing, counsel for SFCC did not dispute this provision but pointed out that this provision is inconsistent with the stipulation because this provision would be unnecessary if the lease transferred with the license. Doc. 148 at 13:18 to 14:10. Ztark disagrees and the Court will discuss these arguments below.

[5] Paragraph number 3 appears twice in the Agreement for the Transfer and Lease of License. Doc. 53-7 at 1.

Correction or Withdrawal of Stipulation," asserting that the discovery process revealed, based on the terms of the Asset Purchase Agreement, that CSF transferred its FCC *license* to SFCC, not the *lease* agreement with Ztark. Doc. 130 at 2. SFCC "therefore gives notice that it is correcting the stipulation in the JSR/PDP to state: 'The College of Santa Fe assigned its interest in its FCC License with Ztark to Plaintiff as of March 10, 2010.'" *Id.* In the alternative, SFCC gives notice that it is withdrawing the stipulation altogether. *Id.* Ztark filed the present motion to strike in response. Doc. 135.

## LEGAL STANDARD

1. **Withdrawing a Stipulation**

"Stipulations are entered into in order to dispense with proof over matters not in issue, thereby promoting judicial economy at the convenience of the parties." *In re Durability Inc.*, 212 F.3d 551, 555 (10th Cir. 2000) (internal quotation marks and citation omitted). As an initial matter, "[a] stipulation is an admission which cannot be disregarded or set aside at will." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1097 (10th Cir. 1991); *see also XY, LLC v. Trans Ova Genetics, LC*, No. 17-CV-00944-WJM-NYW, 2018 WL 7512225, at *2 (D. Colo. Dec. 5, 2018) ("[A] stipulation is a binding agreement between parties that cannot simply be disregarded or set aside by will. By its very essence, therefore, [one side] cannot unilaterally rewrite and substitute a stipulation agreed to by the Parties and filed with the court.") (cleaned up), *report and recommendation adopted*, 2021 WL 5826417. Rather than filing a motion to withdraw its stipulation, SFCC filed a unilateral notice that it was amending or withdrawing its stipulation. Doc. 130. The Court strikes this unilateral notice.

Despite styling its filing as a "Notice," however, the first paragraph of SFCC's filing states, "SFCC now *requests* [that the stipulation in the JSR] be corrected or withdrawn." Doc.

130 at 1 (emphasis added). Given this, and given that the parties primarily focus their arguments on whether the Court should allow SFCC to withdraw its stipulation, rather than on whether an attempted unilateral withdrawal would be proper, the Court will proceed to consider the same.

"Stipulations are not absolute . . . and may be withdrawn whenever necessary to prevent manifest injustice." *Wheeler*, 935 F.2d at 1097 (internal citation omitted). "District courts consequently are vested with broad discretion in determining whether to hold a party to a stipulation or whether the interests of justice require that the stipulation be set aside." *Id.* (internal citation omitted). Given the discretionary nature of allowing a stipulation withdrawal, the Tenth Circuit has recognized that courts generally apply "equitable considerations when enforcing stipulations." *In re Durability*, 212 F.3d at 555; *see also id.* ("The court may relieve a party from an improvident [discovery stipulation] or one that might work injustice.") (cleaned up). Both parties rely on *In re Durability* to support their differing positions, and so it warrants a close look.

*In re Durability* centered on the question of whether a life insurance premium was paid. 212 F.3d at 553. After a company, Durability, purchased a life insurance policy from Sovereign Life Insurance Company, a group of creditors filed an involuntary bankruptcy petition against Durability. *Id*. The insured thereafter died and Sovereign refused to pay out, arguing that a premium had not been paid while Durability was in bankruptcy proceedings. *Id*. at 554. While discovery was ongoing, Sovereign filed a motion for summary judgment, providing evidence of a returned check, an undated notice of lapse, and a notice of returned check as evidence of the nonpayment. *Id*. The trustee stipulated that these facts were not in dispute and based several "propositions of law and fact" on the factual assumption that the premium had not been paid. *Id*. However, before the lower court ruled on Sovereign's summary judgment motion, the trustee

obtained an accounting ledger and affidavit from the bankruptcy receiver that indicated the receiver had in fact paid this premium. *Id*. This new evidence, if considered, created a genuine issue of material fact fatal to Sovereign's summary judgment motion. *Id*. at 557-58. The lower court, however, refused to let the trustee withdraw its initial stipulations and, based on the trustee's initial stipulations, granted Sovereign's motion for summary judgment. *Id*. at 554.

The Tenth Circuit reversed this decision, finding that the lower court abused its discretion "by refusing to consider, when ruling on a motion for summary judgment, new evidence contradicting an earlier stipulation." *Id*. at 555. In doing so, the court examined several equitable considerations, including that the new information was material to summary judgment and that consideration of the new information would not prejudice the non-withdrawing party. *Id. In re Durability*, thus, involved an incorrect stipulation made during summary judgment briefing that the stipulating party, upon learning new information in discovery, attempted to withdraw before the court issued its decision on the summary judgment motion and which, if withdrawn, would have changed the outcome of summary judgment. *Id.* at 557-58.

2. **Good Cause Under Rule 16(b)(4)**

*In re Durability* points out that withdrawing a stipulation may also be controlled by a specific rule of procedure. 212 F.3d at 556. For example, "if a party waits until trial to withdraw stipulations submitted in the pretrial order, the recital of facts may be modified at the trial only to prevent manifest injustice," which comports with Federal Rule of Civil Procedure 16(e). *Id.* (internal quotation marks and citation omitted). Here, a different rule applies.[6]

---

[6] In their response brief, SFCC argues that "analogizing to stipulations made in the form of admissions pursuant to Rule 36, the Tenth Circuit adopted the following two-part test for when the court may allow withdrawal of a stipulation: [1] when the presentation of the merits of an action will be subserved thereby and [2] the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense

7

As explained in the Hearing Order, the Court finds that Rule 16(b)(4) applies because Ztark convincingly argues that, had SFCC not stipulated that the lease of CSF's license transferred at the same time as the license transferred, Ztark would have conducted discovery on this issue and would have filed a counterclaim related to this issue. *See* Doc. 138-1 ¶ 6 (affidavit of Henry Bohnhoff, counsel for Ztark); Doc. 145 at 9 (Hearing Order). SFCC does not object to such discovery or an amendment,[7] Doc. 136 at 9, and the Court agrees that if it were to allow SFCC to withdraw its stipulation it would also need to re-open discovery and permit Ztark to amend its counterclaim. Thus, granting SFCC's request would require the Court to significantly modify its Scheduling Order, under which discovery closed on June 9, 2021, Doc. 16, and so the Court will apply Rule 16(b)(4)'s standard for modifying a scheduling order.

Rule 16(b)(4) provides that a "schedule may be modified only for good cause and with the judge's consent." "In practice, this standard requires the movant to show the scheduling deadlines cannot be met despite [the movant's] diligent efforts." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (cleaned up). "Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." *Id.* (cleaned up).

---

on the merits." Doc. 136 at 4-5. The Court disagrees with this reading of *In re Durability*. The Tenth Circuit was not adopting a two-part test for withdrawing a stipulation in that case, or generally. Instead, it was providing an example of a test that applied to a specific rule or procedure in a different situation—the withdrawal of a request for admission. In providing this example, the court explained that "if a stipulation is before the court in the form of a formal admission pursuant to Rule 36" then the standard of Rule 36(b) applies, i.e., the two-part test listed by SFCC. The present stipulation was not part of a request for admission and so the Court does not apply Rule 36(b)'s standard.

[7] SFCC makes clear, however, that in doing so, it is not waiving its ability to defend against the counterclaim by asserting affirmative defenses such as that the counterclaim is time-barred. Doc. 136 at 9.

**DISCUSSION**

Looking at the big picture, the Court is not just dealing with removing an incorrect stipulation. The stipulation is a barrier in the path SFCC wishes to now travel. But even without this barrier, the path down which SFCC now wishes to travel has long since been closed. And, that SFCC might have ventured down this path years ago when it was open, provides insufficient justification for re-opening the path so that SFCC may explore it this late in litigation.

To begin, it is helpful to review what is no longer in dispute, either because of an agreement by the parties or because of a ruling by the Court. In 2006, Ztark and CSF entered into a valid Capacity Lease Agreement ("CLA") in which Ztark leased CSF's excess broadband capacity. In 2010, CSF transferred its license to SFCC under the terms of an APA. Ztark paid the purchase price to CSF on behalf of SFCC. At that time, Ztark, as a non-public entity, could not hold the license and needed the license to transfer to another public entity (i.e., from CSF to SFCC) so it could continue to lease the excess broadband capacity. At the same time CSF and SFCC entered into the APA, Ztark and SFCC entered into a Transfer Agreement. As part of the Transfer Agreement, Ztark and SFCC contemplated entering into a new CLA, attached to the Transfer Agreement as Exhibit A. The parties agree that, because Ztark paid for the transfer, Ztark could have, at the time of the Transfer Agreement, forced SFCC to sign this new CLA (Exhibit A). But the parties agree that they never did execute the new CLA. Lastly, the parties agree that the license, and a lease of that license, is now worth much more than it was in 2006 or 2010.

With these facts in mind, the Court next considers what obstacles lie ahead if SFCC is allowed to withdraw the stipulation. Such obstacles quickly come into view on examination of

competing arguments the parties would make about whether the CSF-Ztark lease transferred, should the Court allow the at-issue stipulation to be withdrawn.

Ztark argues that an entity that obtains a license, knowing that license is encumbered to a third party, is also bound by the encumbrances associated with the license. Doc. 128 at 19-21. Given that Ztark, not SFCC, paid CSF a $65,000 "purchase price" and a $30,000 "additional payment" in connection with the transfer of the license from CSF to SFCC, Ztark argues that SFCC knew full well when it acquired the license that it was encumbered by a lease with Ztark. Doc. 138 at 12. In fact, CSF and SFCC agreed this payment would satisfy Ztark's lease fee obligation under its 2006 lease agreement with CSF. Doc. 116 at 5. Thus, Ztark argues, SFCC knew the only reason Ztark would pay $95,000 to have a license transferred from CSF (which was closing its doors) to SFCC was to preserve its lease on that license.

SFCC agrees that normally a license would transfer with its encumbrances. Doc. 148 at 24:25 to 25:6. But, it asserts, the plain language of the 2010 agreements and the intent of SFCC and Ztark to enter into the alternative Exhibit A CLA distinguishes this case from the normal situation. In the APA through which CSF sold its license to SFCC, CSF represented the license was "free and clear of all encumbrances." Doc. 53-8 ¶ 3.2. And, the APA lists the only asset to be transferred as "the FCC License." Doc. 53-8 ¶ 1.1. Finally, the APA contains a merger clause indicating that "[t]he agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreement and understandings . . . ." Doc. 53-8 ¶ 9.2. Given these provisions, SFCC argues that the license transferred to SFCC free and clear of any encumbrances.

Ztark, in turn, points out that it was not a party to the APA between SFCC and CSF and that, regardless of what CSF represented, CSF and SFCC did not have the ability to extinguish

10

Ztark's lease interest in the license simply by transferring the license from CSF to SFCC. In other words, a license holder cannot unilaterally cancel a lease on its license by selling the license to a third-party who has actual knowledge of the lease. SFCC replies that, although this might normally be true, such is not the case here because Ztark, through its involvement in the negotiations between CSF and SFCC, acquiesced in the free and clear transfer of the license. Ztark, of course, disputes this, pointing out that it had no incentive to give up any lease interest it held in the CSF license. To the contrary, the very reason it helped negotiate a transfer of the CSF lease to SFCC in 2010, and paid money in connection with that transfer, was to preserve its ability to lease the license.

As a counter to Ztark's argument that its lease interest in the CSF license cannot be extinguished through an agreement between CSF and SFCC, SFCC points to an agreement in which Ztark was a party: the Transfer Agreement between SFCC and Ztark. SFCC notes that the Transfer Agreement, executed at the same time as the 2010 APA, is entitled "Agreement for the Transfer *and Lease of License*" not "Agreement for the Transfer *of Lease of License*." Doc. 53-7 (emphasis added). The transfer agreement provided that SFCC and Ztark would enter into an attached capacity lease agreement—the Exhibit A CLA—once SFCC took transfer of the CSF license. Doc. 53-7 ¶ 3. SFCC highlights that the parties never executed that lease agreement and, as a result, argues there is no lease agreement between SFCC and Ztark as to the license CSF originally held. Ztark responds that nothing prevents the 2006 lease agreement from transferring and being in effect while the Ztark and SFCC discuss a new agreement. That is, the failure to sign the new lease agreement as contemplated does not mean the 2006 lease agreement never transferred.

Even if these arguments are resolved in SFCC's favor—i.e., the CSF license transferred to SFCC free and clear of encumbrances—another hurdle lies in SFCC's path to success. SFCC acknowledges that Ztark paid for the license transfer between SFCC and CSF. The question then becomes: What did Ztark get in exchange for its payment? Ztark argues the benefit it received was the lease of the CSF license now held by SFCC. SFCC, on the other hand, argues that the benefit Ztark received was similar to a right of first refusal—that SFCC would enter into the Exhibit A CLA with Ztark, and no one else. Doc. 148 at 34:20-25.

Assuming SFCC also won its argument that what Ztark paid for was an option to force SFCC to sign the Exhibit A CLA, the next question is: Why doesn't Ztark simply exercise its option, force SFCC to execute the Exhibit A CLA, and moot this entire dispute? In fact, Ztark asserts it has now made a demand for SFCC to enter into the new CLA. Doc. 148 at 83:6-8. But, SFCC says, Ztark chose not to exercise its right to lease the license and, even though the Transfer Agreement contained no deadline for Ztark to exercise its option, it is now too late for Ztark to do so.[8] Doc. 148 at 34:20-25, 90:24 to 91:5.

The point of outlining these arguments is not to resolve them. Instead, summarizing the parties' competing arguments is a precursor to the main questions the Court must consider: How big is SFCC's ask and is that ask justified? In considering whether SFCC's ask is justified it matters whether the stipulation SFCC seeks to withdraw is clearly wrong. The goal of our judicial system is to correctly resolve a case on its merits; proceeding based on an incorrect stipulation is anathema to that goal. But seeking to withdraw a clearly erroneous stipulation to make room for the indisputable truth is different than seeking to withdraw a stipulation so that

---

[8] SFCC also argues that any unjust enrichment claim Ztark may try to bring against it is barred as against a governmental entity. Doc. 131 at 11.

the parties can argue a point in contention. This case presents the latter situation. Rather than clearing the path to make room for an indisputable truth, allowing SFCC to withdraw its stipulation would clear the path to litigate an issue very much in dispute.

Next, in determining the size of SFCC's ask, the Court must consider the implications of granting SFCC's request to withdraw its stipulation. Seeking to withdraw a stipulation no one has relied on and then move forward is different than causing, this late in litigation, the Court to move backwards by re-opening extensive discovery and briefing on a variety of factual and legal issues. The above summary demonstrates that the arguments which would ensue if SFCC is allowed to withdraw its stipulation are extensive. Ztark represents, and SFCC does not contest, that if SFCC withdraws its stipulation Ztark will need to amend its counterclaims and both parties will need to engage in discovery. Once that discovery is completed, the various arguments summarized above must be briefed and decided. All of this would require a drastic change to the Court's scheduling order, which contemplated a discovery termination date of June 9, 2021 and a dispositive motion deadline of July 9, 2021. That is, SFCC is asking a great deal.

Compare this situation to *In re Durability* where the stipulation at issue related only to the summary judgment briefs. 212 F.3d at 554-55. Withdrawal of that stipulation would not have caused significant delay to the entire case because the request to withdraw was made before the court issued a decision on summary judgment. *Id.* As the Tenth Circuit noted, "The stage at which a party requests relief from a stipulation bears heavily on whether the court should grant the relief, and a court must determine whether there are other overriding rules or policy considerations that compel granting or denying such relief." *Id.* at 556.

Here, not only would the withdrawal necessitate extensive additional discovery and briefing, this additional litigation would occur very late in this case. The parties entered the

13

stipulation close to the inception of the case, when first discussing what was at issue in the case and what discovery would be needed to resolve the matters in dispute. *See* Doc. 7 (JSR, filed December 1, 2020). The stipulation remained unchallenged through discovery and motions practice. *See* Doc. 16 (Scheduling Order). When SFCC filed its notice of withdraw on April 26, 2022, almost a year and a half after the parties agreed to it, the parties had already completed discovery, already filed dispositive motions, and already received decisions on those motions. The extension of the long-ago-expired discovery and motions deadlines that would be the necessary product of the withdrawal would thus significantly delay resolution of this case and prejudice Ztark.

Nor can SFCC establish good cause under Rule 16(b) for waiting so late in litigation to attempt to venture down this path. This case is not like *In Re Durability*, where one party entered a stipulation reasonably based on information known at the time, only to later learn new information that indisputably refuted that earlier, reasonable, misapprehension. 212 F.3d at 554. Here, SFCC was a party to both the March 2010 APA with CSF (Doc. 53-8) and the Transfer Agreement with Ztark (Doc. 128-2). Therefore, at the time SFCC stipulated in the JSR that the lease between CSF and Ztark transferred to SFCC, SFCC knew, or should have known, about the circumstances surrounding the transfer of CSF's license to SFCC.

SFCC argues that it did not, however, have a copy of the APA in its possession at the time it made the stipulation. In its notice withdrawing the stipulation, SFCC explained that

> At the time that stipulation was made, the parties had not yet exchanged initial disclosures or responded to requests for production. Ztark first produced a partially executed copy of the Asset Purchase Agreement ("APA") with its document production on January 25, 2021. SFCC's counsel later located a fully executed signature page (without the rest of the APA attached) in its files and produced it on January 21, 2022.

14

Doc. 130 at 1 (internal citations omitted). In response to the motion to strike, SFCC further explains that it "had multiple unsigned copies of the Asset Purchase Agreement in its files . . ." and that SFCC's counsel "had over a dozen drafts of the Asset Purchase agreement in its file, in various forms and redline versions." Doc. 136 at 11. In other words, SFCC asserts that the stipulation "is incorrect and contrary to the facts developed in this case since December 1, 2020." Doc. 130 at 2.

For several reasons, the Court rejects any assertion that SFCC's belated attempt to withdraw its stipulation is justified by information it learned only during the discovery process. First, SFCC provides no reasonable justification for not having copies of contracts to which it was a party. Second, even if SFCC did not have a copy of the APA in its possession at the time it made the stipulation, only a few weeks later, on December 18, 2020, SFCC produced to Ztark an unsigned copy of the APA with language identical to the language in the executed APA that SFCC argues contradicts the stipulation. *See* Docs. 135-1 (certificate of service); Doc. 135-2 (unexecuted agreement produced with initial disclosures); Doc. 53-8 (executed agreement). Yet, SFCC did not attempt to withdraw the stipulation until almost a year and half later, after discovery closed and after the Court ruled on summary judgment. SFCC's explanation fails to address why it needed additional discovery from Ztark to know the terms of the agreement it was a party to over 10 years earlier or why, if it needed such discovery, it did not obtain it during the discovery period. Accordingly, the Court finds that SFCC has failed to show that it acted diligently in moving to withdraw the stipulation; therefore, it has not demonstrated good cause to amend the scheduling order.

Likely because SFCC does not have a compelling justification for attempting to withdraw the stipulation so late, SFCC's counsel attempts to fall on her sword. She asserts she made an

15

honest mistake when entering the stipulation and that SFCC itself should not be prejudiced for its counsel's mistake. Doc. 126 at 12. The Court does not doubt the good faith and intention of counsel. There is no evidence here of gamesmanship or intentional sandbagging. The Court, however, does not view Plaintiff's counsel as having made an obvious mistake for which her client will be punished.

Instead, counsel's decision to enter the stipulation was reasonable. As SFCC acknowledges, Ztark and CSF had a valid lease agreement that would normally act as an encumbrance on the license transfer. Also, Ztark paid thousands of dollars to CSF on behalf of SFCC because it wanted to preserve its ability to lease the CSF license. The argument that, despite the encumbrance, the lease did not transfer and, despite Ztark's payment of an "option" to enter a new lease agreement with SFCC, the option is no longer valid, are all creative legal arguments that are the product of SFCC's counsel's skill, not negligence. It would not have been obvious at the time of the meet and confer that the stipulation, which on its face appeared reasonable, should not be entered because it would later act as a barrier to these creative legal arguments. That is, the legal path SFCC now wishes to travel was relatively hidden at the beginning of litigation in 2020 and became clearer, not as the result of discovery, but through the development of arguments at the very end of the briefing process. Although the stipulation may have been the product of SFCC's counsel's failure to foresee certain creative arguments that few would have seen at the inception of this litigation, this is not a situation where a client suffers an injustice only because counsel negligently stipulated to a clearly erroneous fact.

But, even if SFCC's counsel did make a mistake, between her client suffering from her mistake or the opposing party bearing the brunt of fallout from that mistake, it makes more sense for her client to bear the brunt. As set forth above, withdrawing the stipulation would open the

door to more discovery, briefings, costs, and delays, all of which would prejudice Ztark. Under these circumstances, mistake of counsel alone would not be justification for allowing withdrawal of the stipulation. *See, e.g.*, *Criser v. United States*, 319 F.2d 849, 850 (10th Cir. 1963) ("Mistakes of counsel are not grounds for relief unless the proceedings were a mockery or resulted in the deprivation of constitutional rights."); *Buckmire v. Mem'l Hermann Healthcare Sys. Inc.*, 456 F. App'x 431, 432 (5th Cir. 2012) ("Denial of a Rule 60(b) motion to set aside a dismissal under clause (1) is not an abuse of discretion when the proffered justification for relief is the 'inadvertent mistake' of counsel.") (internal quotation marks and citation omitted); *Charboneau v. Mortg. Elec. Registration Sys., Inc.*, No. 417CV00758ALMCAN, 2018 WL 4997070, at *1 (E.D. Tex. May 29, 2018) ("Good cause [to extend the time to serve under Rule 4(m)] is more than inadvertence, mistake of counsel, or ignorance of the rules.").

As an alternative to its argument that the belatedness of its motion to withdraw was justified, SFCC argues that the prejudice to Ztark is limited because *both* parties forgot about the stipulation until SFCC brought it to the Court's attention in its withdrawal notice. Doc. 148 at 3:24 to 4:3. The implication of this argument is that the stipulation, having been forgotten, had no effect on the course of discovery or motions practice. The Court rejects this argument.

Although Ztark agrees that it did forget about the stipulation, Doc. 138-1 ¶ 5, it argues that it had no reason to give further thought to an issue the parties resolved before discovery even started. Said another way, Ztark assets it did not need to address this issue in its counterclaim, discovery, or summary judgment briefing because it believed SFCC would not challenge the understanding that CSF's lease with Ztark transferred to SFCC along with CSF's license. As counsel for Ztark explains in an affidavit, had SFCC not agreed to the stipulation, or sought to withdraw the stipulation earlier in the case, "that would have altered [counsel] to take steps to

17

establish SFCC's liability under the CSF lease on other grounds." Doc. 138-1 ¶ 6 (affidavit of Ztark's counsel). Thus, Ztark did rely on the stipulation because it allowed Ztark to set aside and forget about the lease-transfer issue.

This point is illustrated by Ztark's counterclaim. In Count III, Ztark brings a claim for breach of duty to negotiate renewal of leases. Doc. 38 at 11. In that count, Ztark groups the 2006 CSF lease (that it says later transferred to SFCC) and the 2006 lease with SFCC together, referring to them as the "Leases." *Id.* at 12 ¶¶ 12-15. As such, Ztark's counterclaim is clearly premised on the idea that the 2006 lease with CSF transferred to SFCC in 2010 when CSF transferred its license to SFCC. Had SFCC refused to stipulate that the CSF lease transferred, thus rejecting the premise on which Ztark's counterclaim is partly based, Ztark surely would have conducted discovery on this issue and briefed it during the briefing period.

Like Ztark, until recently SFCC also acted as if the leases were the same and as if the CSF lease was transferred to it. In is answer to Ztark's counterclaim, SFCC does not list as a defense its theory that the CSF lease did not transfer. *See* Doc. 40 (answer to amended counter claim); Doc. 120 (notice of reliance of prior answer). Further, in response to Ztark's Interrogatory No. 12 that asks SFCC to list "all actions, inactions, and statements of Ztark upon which [SFCC] base[s] any claim that the May 2006 Capacity Lease Agreements are unenforceable," SFCC again made no mention of its theory that the lease with CSF did not transfer to SFCC. Doc. 128-4 at 2-3. And lastly, in briefing dispositive motions, SFCC again treated the two leases as one unit, not distinguishing between the two or mentioning a potential issue with just the CSF lease. *See generally* Doc. 61.

In sum, SFCC's willingness to stipulate to the lease transfer at the beginning of the case combined with its failure to bring up the issue during discovery and briefing, particularly when

directly asked in discovery about SFCC's contentions, provided no reason for Ztark to believe this issue was in contention. Until SFCC filed its notice withdrawing the stipulation late in the case, Ztark had no reason to consider or defend against SFCC's lease-transfer theory. The Court therefore rejects SFCC's argument that the stipulation had no bearing on discovery or briefing because everyone forgot about it and that withdrawing it would not prejudice Ztark.

## CONCLUSION

The issue before the Court is not a question of withdrawing a stipulation for the purposes of correcting the record with an undisputed fact that would not generate additional litigation. Rather, SFCC now offers an entirely new theory of the case—that CSF transferred to SFCC only its license and not the lease agreement—asserted for the first time after the close of discovery, after motions practice, and after the Court disposed of SFCC's other claims. Allowing the stipulation withdrawal SFCC requests would require extensive briefing on new legal questions, re-opened discovery, new counterclaims, and new motions practice. Given the prejudice to Ztark and SFCC's failure to show good cause to amend the scheduling order, the Court denies SFCC's request to withdraw the stipulation.

**IT IS THEREFORE ORDERED** that "Defendant and Counter-Claimant Ztark Broadband, LLC's Objection to, and Motion to Strike, Plaintiff and Counter-Defendant Santa Fe Community College's 'Notice of Correction or Withdrawal of Stipulation'" (Doc. 135) is GRANTED. Plaintiff's Notice of Correction or Withdrawal of Stipulation (Doc. 130) is STRICKEN.

_____
**STEVEN C. YARBROUGH**
**United States Magistrate Judge**